2020 IL App (1st) 191419-U

No. 1-19-1419

Second Division
December 22, 2020

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| MICHAEL A. APPLEGATE, | ) | |
| | ) | |
| Petitioner-Appellant, | ) | |
| | ) | Petition for Direct |
| v. | ) | Administrative Review of an |
| | ) | Order of the Illinois Human |
| ILLINOIS HUMAN RIGHTS | ) | Rights Commission |
| COMMISSION, ILLINOIS DEPARTMENT | ) | |
| OF HUMAN RIGHTS, and PROGRESSIVE | ) | Charge No. 2016 CR 3166 |
| HEALTHCARE CONSULTING, LLC, | ) | |
| | ) | |
| Respondents-Appellees. | ) | |

JUSTICE COBBS delivered the judgment of the court.
Presiding Justice Fitzgerald Smith and Justice Pucinski concurred in the judgment.

**ORDER**

¶ 1    *Held*: The Illinois Human Rights Commission did not abuse its discretion in sustaining the Illinois Department of Human Rights' dismissal of petitioner-appellant's employment discrimination charge for lack of substantial evidence.

¶ 2 Petitioner-appellant, Michael A. Applegate, appeals *pro se* from a final order entered by the Illinois Human Rights Commission (Commission) sustaining the Illinois Department of Human Rights' (Department) dismissal of his charge of employment discrimination against his former employer, Progressive Healthcare Consulting, LLC (Progressive), brought under the Illinois Human Rights Act (Human Rights Act) (775 ILCS 5/1-101 *et seq.* (West 2014)). Petitioner alleged harassment based on his race and age, failure to accommodate his disability, unlawful discharge based on his race, age, and disability, and retaliatory discharge. The Department dismissed his charge, and the Commission sustained that dismissal. On appeal, petitioner argues that there was substantial evidence to support his employment discrimination charge. For the following reasons, we affirm.

¶ 3                                I. BACKGROUND

¶ 4 Petitioner was employed with Progressive as a hospital liaison from 2013 to 2016. This position involved networking with hospitals, clinics, physicians, and staff to obtain patient referrals for placement in Progressive's network of facilities. Petitioner claims that he never had any disciplinary action during his employment and was a top performer. He was discharged from his employment on February 12, 2016.

¶ 5 On March 3, 2016, he filed a discrimination charge with the Equal Employment Opportunity Commission (EEOC). After the EEOC dismissed the charge, he requested that the Department investigate his charge pursuant to sections 2-102(A) and 6-101(A) of the Human Rights Act (775 ILCS 5/1-102(A), 5/6-101(A)) (West 2014)). Petitioner asserted seven bases for the charge. In counts A and B, petitioner alleged that his supervisor at Progressive harassed him based on his race (black) and age (59 years old). In count C, he claimed that Progressive failed to reasonably accommodate his disability (hip disorder). In counts D, E, F, he claimed that

Progressive discharged him due to his race, age, and disability. Finally, in count G, he alleged that Progressive discharged petitioner in retaliation for his internal complaint. The Department's investigation revealed the following facts.[1]

¶ 6     In December 2015, Nathan Yosef became petitioner's supervisor. Petitioner alleges that between December 2015 and February 2016, Yosef harassed him about his race and age in the nature of "[u]nfairness, offensive insults, jokes, verbal harassing, and threats." Specifically, he alleged that Yosef commented that petitioner looked like "Eddie Murphy's father" and "Michael Jordan's father" and that he walked like "an old man." On January 20, 2016, petitioner sent a letter to Yair Zuckerman, Chief Executive Officer (CEO) of Progressive, complaining about Yosef's comments and behavior towards him. In the letter, petitioner stated that he believed Yosef was trying to provoke him into acting unprofessionally; that Yosef had a poor attitude; that Yosef regularly acted unprofessionally during meetings by eating or taking phone calls; and that Yosef's behavior was inappropriate and should not be tolerated. The letter also relayed a dispute between petitioner and Yosef regarding petitioner's year-end bonus for 2015.

¶ 7     Petitioner was scheduled to meet with human resources to discuss the matter but he is unaware of any outcome of his complaint because he was discharged less than a month later. He claims that this internal complaint constituted engaging in a "protected activity" for the purposes of his retaliation allegations. He also claims that after he submitted the complaint, Yosef stopped inviting him to marketing events, returning his e-mails and phone calls, and responding to his new ideas and that Yosef did not exhibit the same behaviors towards petitioner's white and non-black coworkers.

_____

[1] The investigation's exhibits were not included in the record but many of the relevant e-mails and letters were included as petitioner's exhibits.

¶ 8      As to petitioner's claim of disability discrimination, he submitted a verification of disability dated February 24, 2017 that stated he was diagnosed with left hip osteoarthritis. This hip disorder resulted in petitioner walking with a limp at the end of 2015 and beginning of 2016. Petitioner admitted that Yosef was not aware of his hip disorder. Petitioner claims that he requested an accommodation on December 18, 2015 in an e-mail to Zuckerman, wherein he informed Zuckerman that he would be having a necessary "medical procedure on [his] leg" on December 21, 2015. Petitioner told Zuckerman that he would use his vacation week of December 21 to December 29 to recover from the procedure. He requested to work from home during the following week, as he would be unable to conduct on-site visits during the week of December 29 to January 4.

¶ 9      Zuckerman responded to the request via e-mail the same day, stating that he hoped the procedure went well and copied Jessica McKee, the human resources manager, to ensure everything was handled correctly regarding petitioner's rights and benefits. The surgery, however, was postponed and petitioner returned to work as usual following his vacation week. In an e-mail to petitioner dated January 6, 2016, McKee informed him that she did not know the details of his situation but wanted to reach out in case he needed Family Medical Leave Act (FMLA) paperwork for a leave of absence. Petitioner responded that he was feeling great and did not need any FMLA paperwork or to take a leave of absence.

¶ 10     There were two doctor's notes submitted to the Department dated February 11 and February 16, which stated that he would be unable to work for the next 6-9 months due to an illness. Petitioner claims Yosef was aware of his doctor's appointment preceding the February 11 note as it was included on his weekly report for the week of February 8 through 11. Regardless,

the investigation found no evidence that petitioner made any further requests relating to his medical situation prior to his discharge.

¶ 11    As related to petitioner's discharge, the Department compiled the following evidence. In a February 11 e-mail to petitioner, the day before petitioner's discharge, Yosef stated that he texted petitioner asking to call him to discuss a work issue. According to Yosef, petitioner's response was that Yosef should make the request over e-mail. Yosef replied that the conversation would be exceedingly long and more conducive to a phone conversation. Yosef gave petitioner available times on February 12, 2016 to speak, and petitioner stated that 9 a.m. was fine. In an e-mail the following morning sent shortly before 9 a.m., petitioner told Yosef he preferred conversations in writing because it could be re-read, better understood, and could result in a more professional answer. He continued that everyone had their own style of communicating and written words worked better for him. Petitioner also stated that at a meeting on January 19, 2016, Yosef did not celebrate his success but instead disregarded his accomplishments and insulted his intelligence. Petitioner believed that e-mails would be more appropriate to avoid unnecessary conflicts and that he and Yosef could talk "next week."

¶ 12    Petitioner stated that he received an e-mail from human resources stating that petitioner had declined Yosef's request to speak to him and failed to answer Yosef's phone call. Later that day, during a phone conversation between petitioner, McKee, and Yosef, petitioner was informed that he was discharged from his employment but could reapply for his position if he could commit to a good working relationship with his supervisor.[2]

_____

[2] Though petitioner appears to contest the precise date of his termination, claiming he was not aware of his termination until February 15, he provides in his statement of facts that he was discharged on February 12, 2016.

¶ 13    On February 14, 2016, petitioner sent a letter to Zuckerman regarding the situation. In the letter, petitioner relayed the events of February 12 and stated that he was not shocked when Yosef informed him that he was being discharged because he felt that Yosef was always trying to provoke him for that purpose. Petitioner also stated that Yosef told him that he was discharged due to his insubordination regarding the phone call incident. He continued in the letter that he had been a dedicated employee and that his work phone and e-mail had been cut off just prior to the phone call with McKee and Yosef.

¶ 14    During a follow-up meeting on February 15, 2016, petitioner stated that he could not work with Yosef and asked for a different supervisor. At the end of the meeting, it was confirmed that petitioner had been discharged on February 12. Petitioner called in sick on February 16 and 17. He received a separation agreement on February 18, indicating that his employment had ended on February 12. Petitioner stated that he refused to sign the agreement because it was not truthful.

¶ 15    On February 18, 2016, McKee sent petitioner an e-mail advising him not to communicate with Progressive employees, other than human resources and legal, and that his e-mails regarding taking sick days were inappropriate.

¶ 16    The Department's investigation noted that Progressive's Rules of Conduct provided that insubordination, including the refusal to carry out supervisory instructions, was unacceptable and could result in discharge. The Department also noted Progressive's At-Will Employment Policy, which states that unless employees were subject to a collective bargaining agreement, employment with Progressive was at-will, meaning that Progressive could terminate employment at any time and for any reason.

¶ 17    Based on the investigation detailed above, the Department dismissed petitioner's charge, finding that each basis lacked substantial evidence to support it. As to counts A and B, the

Department found that the conduct was neither severe nor pervasive and did not rise to the level of harassment, and the complaint petitioner submitted regarding Yosef did not allege racial or age harassment. As to count C, the Department stated that the evidence did not show that petitioner requested an accommodation for his hip disorder that Progressive denied. As to counts D, E, and F, the Department found that petitioner was not discharged due to his race, age or disability, but rather due to insubordination related to dispute with his supervisor. As to count G, the Department found that there was no evidence that petitioner engaged in a protected activity or of any retaliation on behalf of Progressive.

¶ 18    Petitioner filed a request for review with the Commission, and the Department filed a response. On June 11, 2019, the Commission issued a decision sustaining the dismissal of petitioner's charges. In so ruling, the Commission stated (1) that Yosef's comments did not rise to the level of actionable harassment; (2) that petitioner's need for a disability accommodation was obviated by the postponement of his surgery and that Progressive was not aware that petitioner had a disability as defined in the Act; (3) that there was no substantial evidence that petitioner was meeting Progressive's legitimate expectations or that similarly situated employees outside petitioner's protected classes were treated more favorably; and (4) that there was no evidence of retaliation because petitioner did not clam any violation of the Human Rights Act prior to his discharge.

¶ 19    Petitioner timely filed a petition with this court for direct review of the Commission's decision.

¶ 20                                  II. ANALYSIS

¶ 21 On appeal, petitioner argues that the Commission erred in finding that his claims of discrimination lacked substantial evidence. He requests that this court reinstate his charges of discrimination.

¶ 22 The Human Rights Act is the "exclusive source for redress of civil rights violations" (*Village of Maywood Board of Fire & Police Commissioners v. Department of Human Rights*, 296 Ill. App. 3d 570, 581 (1998)) and prohibits unlawful discrimination against a person on the basis of race, age, or disability, among other bases (775 ILCS 5/1-102(A) (West 2014)).

¶ 23 The Human Rights Act provides the following procedure for a discrimination claim. A discrimination charge may be filed with the Department within 180 days after the date that a civil rights violation was allegedly committed. 775 ILCS 5/7A-102(A) (West 2014). After investigating a charge, the Department issues a report determining whether there is "substantial evidence" that an act of discrimination occurred. *Id.* § 5/7A-102(A)-(C). "Substantial evidence is evidence which a reasonable mind would find sufficient to support a particular conclusion and consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Id.* § 5/7A-102(D)(2). However, mere speculation and conjecture do not constitute substantial evidence of discrimination. *Willis v. Illinois Department of Human Rights*, 307 Ill. App. 3d 317, 326 (1999). If substantial evidence is not found, the Department must dismiss the charge. 775 ILCS 5/7A-102(D)(3) (West 2014).

¶ 24 If the Department dismisses a charge, the petitioner may request review of that dismissal by the Commission. 775 ILCS 5/8-103(A)(1) (West 2014). In conducting its review, the Commission may consider the Department's report, any argument and supplemental evidence, and the results of any additional investigation conducted by the Department in response to the request.

*Id.* § 5/8-103(B). The Commission's final decision is subject to direct administrative review by this court. *Id.* § 5/8-111(B)(1).

¶ 25    This court reviews the Commission's final decision for abuse of discretion. *Young v. Illinois Human Rights Commission*, 2012 IL App (1st) 112204, ¶¶ 32-33. Under the abuse of discretion standard, we will not disturb the Commission's decision unless it is arbitrary or capricious. *Owens v. Department of Human Rights*, 403 Ill. App. 3d 899, 917 (2010). A decision is arbitrary or capricious if it contravenes the legislative intent, fails to consider a crucial aspect of the problem, or offers an impossible explanation contrary to agency expertise. *Young*, 2012 IL App (1st) 112204, ¶ 33. We will not, however, reweigh the evidence or substitute our judgment for that of the Commission. *Owens*, 403 Ill. App. 3d at 917.

¶ 26    When analyzing employment discrimination charges brought under the Human Rights Act, we follow the framework set forth in federal caselaw relating to federal anti-discrimination statutes, including, as relevant here: Title VII of the Civil Rights Act of 1964 (Title VII) (42 U.S.C. § 2000e *et seq.* (1982)), the Age Discrimination in Employment Act (ADEA) (29 U.S.C. § 621 *et seq.*(1982)), and the Americans with Disabilities Act of 1990 (ADA) (42 U.S.C. § 12101 *et seq.* (2012)). See *Zaderaka v. Illinois Human Rights Commission*, 131 Ill. 2d 172, 178 (1989) (stating that claims under the Human Rights Act are to be evaluated in accordance with federal decisions interpreting federal anti-discrimination laws).

¶ 27    Discrimination can be proved through either direct or indirect evidence. *Sola v. Illinois Human Rights Commission*, 316 Ill. App. 3d 528, 536 (2000). Direct evidence of discrimination is evidence that a petitioner's race, age, or disability was a determining factor in the employment decision. *Lalvani v. Illinois Human Rights Commission*, 324 Ill. App. 3d 774, 790 (2001). Where,

as here, direct evidence is unavailable, indirect evidence may be used to sustain a case of employment discrimination. *Sola*, 316 Ill. App. 3d at 536.

¶ 28   To prove discrimination indirectly, we follow the three-part test enunciated in *McConnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), and adopted by the Illinois Supreme Court in *Zaderaka*, 131 Ill. 2d at 178-79. A plaintiff must first establish by a preponderance of the evidence a *prima facie* case of unlawful discrimination. *Zaderaka*, 131 Ill. 2d at 178-79. If the plaintiff establishes a *prima facie* case, a rebuttable presumption arises that the employer unlawfully discriminated against plaintiff, which the employer can rebut by articulating a legitimate non-discriminatory reason for its decision. *Id.* Finally, if the employer rebuts the presumption, the plaintiff must prove by a preponderance of the evidence that the articulated reason was not the true reason but was a pretext for unlawful discrimination. *Id.*

¶ 29   In the instant action, the Commission agreed with the Department that petitioner was unable to establish a *prima facie* case for discrimination under any of the seven alleged bases. We will address each of these bases in turn.

¶ 30                               A. Counts A and B

¶ 31   Petitioner first claims that he suffered harassment due to his race and age which created a hostile work environment. Specifically, he points to his supervisor's comments that he "walked like an old man" and resembled "Eddie Murphy's father" and "Michael Jordan's father."

¶ 32   "Harassment" is defined under the Human Rights Act as "any unwelcome conduct on the basis of an individual's actual or perceived [race or age] that has the purpose or effect of substantially interfering with the individual's work performance or creating an intimidating, hostile, or offensive working environment." 775 ILCS 5/2-101(E-1) (West 2014). An actionable claim for harassment or hostile work environment contains the following four elements: (1) the

employee was subject to unwelcome harassment; (2) the harassment was based on a reason forbidden by anti-discrimination laws; (3) the harassment was so severe or pervasive that it altered the conditions of employment and created a hostile or abusive working environment; and (4) there is a basis for employer liability. *Smith v. Illinois Department of Transportation*, 936 F. 3d 554, 560 (7th Cir. 2019).

¶ 33 In determining the severity of the harassment, which is often the most crucial element, we follow the two-part test set out in the Title VII case of *Harris v. Forklift Systems, Inc.*, 510 U.S. 17 (1993). See *Cook County Sheriff's Office v. Cook County Commission on Human Rights*, 2016 IL App (1st) 150718, ¶ 32. Under that test, the petitioner must present evidence that the employer engaged in behavior (1) that was severe or pervasive enough to create a work environment that a reasonable person would find to be "hostile or abusive"; and (2) that the employee subjectively perceived to be hostile or abusive. *Harris*, 510 U.S. at 21-22. In making this determination, the court should consider "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Id.* at 22-23. Further, to trigger the protective measures of anti-discrimination laws, an employee must be faced with a "steady barrage" of offensive comments and "more than a few isolated incidents of harassment[.]" *Village of Bellwood Bd. of Fire and Police Commissioners v. Human Rights Commission*, 184 Ill. App. 3d 339, 350 (1989).

¶ 34 Here, the record shows that there was not substantial evidence to establish a *prima facie* case of harassment based on either race or age. Petitioner alleged that his supervisor made comments related to his race, *e.g.* calling him Eddie Murphy and Michael Jordan's father, and age, *e.g.* stating that he walked like an old man, that he found insulting and offensive. However, the

Commission concluded that though those comments, though certainly inappropriate and offensive, did not rise to the level of actionable harassment as they were neither severe nor pervasive. Moreover, the comments were not physically threatening. Though the comments appear to have contributed to the conflict between petitioner and Yosef, which arguably affected his work performance, they were not the only problem between the two and are more akin to isolated incidents than a steady barrage of severely offensive racial or ageist epithets. Thus, the Commission's finding was not arbitrary or capricious and we cannot say that the Commission abused its discretion in dismissing petitioner's claim that he suffered harassment based on his race or age.

¶ 35                                    B. Count C

¶ 36    Under count C, petitioner alleges that Progressive failed to accommodate his disability and that the e-mails between himself and the CEO and human resources confirm that they were aware of his disability and need for accommodation.

¶ 37    "Disability" is defined under the Human Rights Act as "a determinable physical or mental characteristic of a person *** which may result from disease, injury, congenital condition of birth or functional disorder and which characteristic *** is unrelated to the person's ability to perform the duties of a particular job or position." 775 ILCS 5/1-103(I)(1) (West 2014).

¶ 38    The Department requires that employers must make reasonable accommodations of known physical limitations of otherwise qualified disabled employees. 56 Ill. Admin. Code 2500.40(a) (2009). The employee bears the burden of asserting the duty to accommodate; showing that an accommodation was requested; and demonstrating that accommodation was necessary for adequate performance. *Owens*, 356 Ill. App. 3d at 53.

¶ 39    To establish a *prima facie* case for denial of a reasonable accommodation, a petitioner must demonstrate that (1) he suffers from a disability within the meaning of the Human Rights Act; (2) the employer had knowledge of a disability; (3) petitioner requested a reasonable accommodation or the need for a reasonable accommodation was obvious; (4) the employer failed to accommodate petitioner; and (5) with or without a reasonable accommodation, petitioner was qualified for their job. *Illinois Department of Corrections v. Illinois Human Rights Commission*, 298 Ill. App. 3d 536, 540 (1998).

¶ 40    Here, the facts clearly demonstrate that Progressive was unaware of petitioner's hip disorder. Petitioner informed Zuckerman in a letter that he was having surgery over his vacation week at the end of December and that during the following week he would need to work from home to aid in his recovery. Zuckerman responded to the e-mail, wishing petitioner a speedy recovery and asking McKee to step in to ensure proper protocol was followed regarding his request. In an e-mail from McKee to petitioner, McKee specifically stated that she was unaware of the specifics of his medical situation but that she could provide him with the necessary FMLA paperwork if needed. At no point during any of these communications did petitioner explicitly state that he had a hip disorder or any disability whatsoever, and there was also no evidence that McKee or Zuckerman knew precisely what petitioner's medical problems were. The doctor's notes that were included in the record were submitted to Progressive following petitioner's termination and, thus, have no bearing on this issue. Moreover, Progressive did not deny petitioner reasonable accommodation because petitioner effectively withdrew his request once his surgery was postponed and he e-mailed McKee stating that he was doing well and did not need any FMLA paperwork. Though petitioner argues on appeal that McKee's e-mail to him regarding his request was not timely, this is simply a moot point as petitioner did not need any accommodations

following the postponement of his surgery. Therefore, there is not substantial evidence in the record that Progressive failed to accommodate petitioner's disability.

¶ 41                                    C. Counts D, E, and F

¶ 42     Under these three counts, petitioner claims that he was wrongfully terminated due to his race, age, and disability based on the same facts alleged for the first three counts.

¶ 43     In order to establish a *prima facie* case of employment discrimination, a petitioner must demonstrate that: (1) he is a member of a protected class (race and age); (2) he was meeting his employer's legitimate business expectations; (3) he suffered an adverse employment action; and (4) the employer treated similarly situated employees outside the class more favorably. *Owens*, 403 Ill. App. at 919.

¶ 44     The Commission found that petitioner was unable to provide substantial evidence as to the second and fourth elements. The record supports these findings. First, the investigation revealed evidence that petitioner was, in fact, not meeting Progressive's legitimate expectations at the time of his discharge where he had engaged in insubordination in violation of Progressive's Rules of Conduct policy. Second, there was no evidence in the record that Progressive treated similarly situated employees more favorably than petitioner. Petitioner did not identify any such employee. Thus, the Commission did not abuse its discretion in finding that petitioner did not establish a *prima facie* case of racial or age discrimination.

¶ 45     In regards to disability discrimination, this court has stated that a *prima facie* case is established where the petitioner shows that: (1) he is disabled as defined in the Human Rights Act; (2) an adverse action was taken against the employee due to his disability; and (3) the disability is unrelated to the petitioner's ability to perform the functions of his job. *Van Campen v.*

*International Business Machines Corp.*, 326 Ill. App. 3d 963, 971 (2001); *Lake Point Tower, Ltd. v. Illinois Human Rights Commission*, 291 Ill. App. 3d 897, 903 (1997).

¶ 46    There is no evidence in the record that petitioner's discharge was related to his hip disorder or his request to work from home. First, McKee and Zuckerman appeared to be unaware of petitioner's medical issues, at least to the point at which they would constitute a disability. Second, Progressive's discharge was related to petitioner's insubordination and at no point during the termination proceedings was any allusion made to petitioner's hip disorder or his request to accommodate. Thus, the Commission did not abuse its discretion in finding that this basis for discrimination lacked substantial evidence to establish a *prima facie* case.

¶ 47                                    D. Count G

¶ 48    Finally, as to retaliatory discrimination, petitioner claims that he had engaged in "two separate protected activities" and should have been protected from termination during the investigation of his internal complaint.

¶ 49    Section 6-101(A) of the Human Rights Act provides, in pertinent part, that it is a civil rights violation for a person to "[r]etaliate against a person because [he] has opposed that which [he]reasonably and in good faith believes to be unlawful discrimination, *** because [he] has made a charge, filed a complaint, testified, assisted, or participated in an investigation, proceeding, or hearing under this Act, or because [he] has requested, attempted to request, used or attempted to use a reasonable accommodation as allowed by this Act." 775 ILCS 5/6-101(A) (West 2014). In order to establish a *prima facie* case of retaliation, a petitioner must show that: "(1) [he] was engaged in a protected activity; (2) [his] employer committed a material adverse act against [him]; and (3) a causal nexus existed between the protected activity and the adverse act." *Hoffelt v. Illinois Department of Human Rights*, 367 Ill. App. 3d 628, 634 (2006). Retaliatory discrimination can be

shown through the short time span between engaging in the protected activity and the employer's adverse action. *Id.* at 638. However, "[t]he element of causation is not met if the employer has a valid basis, which is not pretextual, for discharging the employee." *Hartlein v. Illinois Power Co.*, 151 Ill. 2d 142, 160 (1992).

¶ 50    The Commission found that petitioner failed to establish a *prima facie* case because he was not engaged in a protected activity under the Human Rights Act and because Progressive had a valid basis for taking the adverse action of discharging petitioner. Based on the record before us, we cannot say that the Commission abused its discretion in coming to both of these conclusions.

¶ 51    This count is premised on petitioner's contention that his internal complaint about Yosef was a "protected activity" within the meaning of the Human Rights Act. However, petitioner is incorrect, as the complaint simply does not contain any allegations of discrimination. Rather, it only refers to Yosef's behavior as unprofessional, insulting, and inappropriate. We cannot construe the internal complaint as one of discrimination where the substance of it does not support such a finding. Additionally, petitioner's request for accommodation cannot be construed as a protected activity because at the time of his discharge he had withdrawn his request and stated that it was no longer needed.

¶ 52    Even if petitioner's internal complaint or request for accommodation constituted a protected activity, he would still be unable to establish a *prima facie* case of retaliatory discharge because the causal nexus is absent here. Though the discharge was close in time to both the request for accommodation (40 days later) and the complaint (17 days later), Progressive had a clear, valid reason for discharging petitioner. Regardless of the relationship between petitioner and Yosef, petitioner cancelled a work-related scheduled phone call with his supervisor and attempted to instruct his supervisor as to how he would like to communicate regarding his job responsibilities.

He was, thereafter, terminated and offered the opportunity to reapply if he could commit to working with Yosef better in the future. Petitioner declined this offer and requested that he be assigned a different supervisor. Progressive had no obligation to comply with Petitioner's request to direct his own employment and continued with Petitioner's termination by sending him the separation agreement. The Commission's finding that petitioner's discharge was based on a non-discriminatory, legitimate reason is supported by the record and was not arbitrary or capricious.

¶ 53    Accordingly, the Commission did not abuse its discretion in concurring with the Department that this basis for discrimination lacked substantial evidence.

¶ 54                                        III. CONCLUSION

¶ 55    For the reasons stated, we affirm the decision of the Illinois Human Rights Commission.

¶ 56    Affirmed.